UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
REACH MUSIC PUBLISHING, INC. et al.,    :
    :
    :
                  Plaintiffs,    :          OPINION AND ORDER
    :
        -v.-          :
    :          09 Civ. 5580 (LTS) (GWG)
    :
WARNER CHAPPELL MUSIC, INC. et al.,    :
    :
                Defendants.    :
---------------------------------------------------------------x

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

        Counterclaim Plaintiff Protoons, Inc. ("Protoons") has moved pursuant to Federal Rule of

Civil Procedure 26 and Federal Rules of Evidence 403 and 702 to strike in its entirety the expert

report of Robert E. Allen submitted by Counterclaim Defendants Reach Music Publishing, Inc.

("Reach Music"), David Reeves, Reach Global, Inc. ("Reach Global" or "Reach"), and Michael

Closter (collectively, the "counterclaim defendants").  Because we conclude that the opinions in

this report, with some exceptions noted below, are admissible, Protoons' motion is denied.

I.      BACKGROUND

        A.    Counterclaim Defendants' Contentions

        For purposes of providing background for this motion, we summarize the counterclaim

defendants' factual contentions.  While Protoons disputes many of these contentions and asserts

that important facts have been omitted, the counterclaim defendants' factual contentions provide

the basis for the expert testimony they are offering and provide the justification for their

arguments as to that testimony's relevance.   Obviously, Protoons will be free to offer evidence

contradicting the counterclaim defendants' version of the facts at trial.

As described by the counterclaim defendants, David Reeves is a songwriter who co-wrote many compositions for the musical group Run-D.M.C.  See Counterclaim Defendants' Memorandum of Law in Opposition to Protoons' Motion to Strike the Expert Report of Robert E. Allen, filed Nov. 12, 2013 (Docket # 202) ("Counterclaim Def. Mem."), at 4.  On May 1, 1988, Reeves, along with others involved with the compositions, entered into what the parties have termed "songwriter agreements" with Russell Simmons, the CEO and Chairman of Rush Groove.  Unbeknownst to Reeves, his songwriter agreement transferred his rights in certain compositions to Protoons.  Id.  At the time he entered into his songwriter agreement, Reeves was not familiar with Protoons and had no dealings with Protoons.  Id.  Reeves did not keep a copy of the songwriter agreement.  Id.

Nearly two decades later, on July 19, 2007, Reeves entered into an agreement with Reach Global, in which Reeves purported to assign to Reach Global his rights to the same compositions that he had previously transferred to Protoons in his songwriter agreement.  Id.  Because Reeves was unaware of Protoons' rights to the compositions, he represented to Reach Global and to Reach principal Michael Closter that he "had never signed away any of his rights in the Compositions previously."  Id.  Despite Reeves' representations, Reach and Closter made numerous attempts to determine if there were any other parties who had interests in the compositions.  Id. at 5.  They ran multiple searches for recorded documents and copyright registrations with the United States Copyright Office, all of which failed to reveal any information about Reeves' prior conveyance to Protoons.  Id.  As part of this due diligence, Reach received documents from Reeves' attorney, Lita Rosario-Davis.  Id.  Although Rosario-Davis gave Reach certain unsigned draft agreements, her documents did not include any copies of the songwriter agreement or any document indicating that Reeves had signed away any of his

2

rights in the compositions.  Id.  Accordingly, Reach concluded that Reeves possessed the rights to the compositions and paid Reeves an aggregate royalty advance of $55,000 for a portion of his rights to the compositions.  Id.

After executing the 2007 agreement with Reeves, Reach contacted Warner/Chappell Music, Inc., a sub-licensee of Protoons, to ask why it was infringing upon Reach's rights to the compositions.  Id.  Warner/Chappell responded that it possessed the rights to exploit the compositions but did not provide any further explanation.  Id. at 6.  In June 2008, Closter, Reach's principal, contacted Protoons' counsel Mark Levinsohn to inquire about Protoons' alleged rights to the compositions.  Id.  In response, Levinsohn asserted that Reeves had "signed away all of his rights" to the compositions to Protoons but did not provide any documentation or other evidence on this point.  Id. at 7.  Levinsohn further declared that Reeves was entitled to nothing and that Protoons would "bury" Reach in litigation fees if it pursued a claim for the compositions.  Id.  According to counterclaim defendants, "Levinsohn never once provided Closter with any information about [the songwriter agreements] nor even confirmed whether or not they existed."  Id.  Thus, Levinsohn never confirmed "(1) whether there was a contract at all (as opposed to a mere assignment, for example); (2) if there was a contract, what was Reeves' bargain in that contract, such as royalty payments; (3) who were the parties, and did they include Protoons; (4) whether there was any covenant or implied promise not to sue Protoons; (5) what rights or obligations, if any, Reeves granted or promised to Protoons; (6) whether it was just an assignment, and if so, to whom; or (7) whether the purported contract was valid."  Id.

In an email to Closter on July 17, 2008, Levinsohn made "vague and unsubstantiated references" to certain "signed agreements" but did not provide any details about the agreements. Id.  That same day, Closter responded to Levinsohn's email by asserting that Protoons had not

provided any proof for its claim to the compositions in the form of copyright assignments, agreements, or accountings.  Id. at 7-8.  From that point on, Protoons continued to refuse to produce any such documentation until after this lawsuit was filed.  Id.  Ultimately, Protoons provided counterclaim defendants with copies of several songwriter agreements in January 2010 pursuant to its discovery obligations.  Id.

      B.     Procedural History

On September 3, 2008, Reeves and Reach Global filed an action in federal court against Protoons and Warner/Chappell asserting that Reeves and Reach Global were co-owners of the compositions, and therefore, that Protoons and Warner/Chappell must account for any income they received from exploitation of the compositions.  See Complaint, filed Sept. 3, 2008 (Docket # 1 in 08 Civ. 7722).  That case was ultimately dismissed.  See Notice of Dismissal Without Prejudice, filed Oct. 1, 2008 (Docket # 7 in 08 Civ. 7722).  A suit was filed in state court that was also dismissed.  See Memorandum of Law in Support of Protoons' Motion to Strike the Expert Report of Robert E. Allen Submitted by Counterclaim Defendants, filed Nov. 5, 2013 (Docket # 200) ("Protoons Mem."), 4-5.

On June 17, 2009, Reach Music and Reeves brought the instant action, naming Protoons and Warner/Chappell as defendants, see Complaint, filed June 17, 2009 (Docket # 1), and on November 20, 2009, Protoons asserted counterclaims against Reach, Reeves, and Closter, see Answer and Counterclaims of Defendant and Counterclaim Plaintiff Protoons, filed Nov. 20, 2009 (Docket # 23).  After extensive litigation, the Court dismissed the complaint with prejudice.  See Order, filed Aug. 12, 2010 (Docket # 61).  Protoons then filed amended counterclaims.  See Amended Counterclaims of Defendant and Counterclaim Plaintiff Protoons, filed Nov. 24, 2010 (Docket # 68) ("Am. Compl.").  Following motion practice, the Court

dismissed the counterclaims with the exception of (1) a counterclaim against Reeves for breach of contract for bringing suit against Protoons in contravention of the covenant not to sue contained in the songwriter agreement, and (2) a counterclaim against Closter, Reach Music, and Reach Global for tortiously interfering with the songwriter agreement by inducing Reeves to sue Protoons in violation of the covenant not to sue.  See Reach Music Pub., Inc. v. Warner/Chappell Music, Inc., 2011 WL 3962515, at *8 (S.D.N.Y. Sept. 7, 2011).

C.      Allen's Expert Report

Counterclaim defendants have retained as an expert Robert E. Allen, an entertainment lawyer who specializes in music publishing, intellectual property, and content licensing and negotiations.  See Expert Report of Robert E. Allen (annexed as Ex. A to Declaration of Bradley J. Mullins in Support of Protoons' Motion to Strike the Expert Report of Robert E. Allen Submitted by Counterclaim Defendants, filed Nov. 5, 2013 (Docket # 201) ("Mullins Decl.")) ("Allen Report"), at 1.  As the principal of a consulting firm, Allen provides expertise in digital entertainment, new media, and intellectual property to clients in the music, television, motion picture, and internet industries.  Id.  Allen has also served as a senior executive for large music publishing companies such as Polygram Music Publishing Group and Universal Music Publishing Group.  Id. at 2.  In his career as an attorney in the entertainment industry, Allen's activities have included "negotiating and drafting recording agreements and amendments, producer agreements, songwriter agreements," id., "negotiating and drafting various deal memorandums, agreements [and] conducting due diligence on catalog acquisition agreements [by] researching copyright infringement claims, preparing related correspondence and negotiating settlements and release agreements," id., and "creating, drafting and negotiating proposals, licenses and agreements relating to digital media, asset acquisition, . . . and internet

licensing," id.  In the report, Allen provides his opinion "regarding music industry custom and practices as contrasted with [the] actions of Protoons . . . and its counsel, Mark Levinsohn . . . in responding to the Reach Parties [sic] inquiries regarding the status of Protoons' rights in the compositions at issue in this litigation." Id. at 3-4.

In the section of his report entitled "Summary of Opinion," Allen concludes that "Levinsohn's statements and conduct on behalf of Protoons in response to the Reach Parties' inquiries regarding the status of Protoons' rights in the compositions . . . were contrary to the custom and practice in the music publishing industry." Id. at 4.  To support his opinion, Allen explains that he has "never" encountered an attorney who behaved as Levinsohn had in "assert[ing] his or her client's rights as a copyright owner, while at the same time withholding the ownership documentation in his or her possession, and declining to produce them until after a lawsuit was filed." Id.  Indeed, Allen recounts that he has specifically seen "the opposite" conduct on "numerous occasions." Id.  Allen explains that professionals in Levinsohn's situation "would produce the transfer agreement, assignments, registrations, or other proof of copyright ownership to support their clients' positions" and would "provide details to further support those positions." Id.  Allen opines that "Levinsohn's refusal to provide readily available documentation to prove Protoon's [sic] rights amidst a copyright dispute, coupled by his refusal to provide any specific details about any aspect of the agreement, would be consistent with the actions of a music publisher that does not control the copyright it claims to represent." Id.

In the section of the report entitled "Basis of Opinion," Allen recounts the facts that led him to these conclusions, essentially recounting the version of the facts favored by the counterclaim defendants.  Id. at 5-7.  Allen notes in this section that "[i]n over 18 years of experience as a music publishing industry attorney and based on my familiarity with the custom

6

and practice of the industry, I cannot think of an instance where a party in possession of documentation supporting its claim of ownership persisted in its refusal to disclose the documentation for more than two years after a lawsuit was filed." Id. at 7.  To the contrary, he states, "a copyright attorney and music publishing professional in [Levinsohn's] situation would agree to disclose a transfer agreement, assignment, registration or other proof of copyright ownership in his or her possession to support their client's position and to resolve any questions of ownership prior to a lawsuit being filed." Id. at 8.

      D.     The Instant Motion

     Protoons has now moved pursuant to Federal Rule of Civil Procedure 26 and Federal Rules of Evidence 403 and 702 to strike Allen's report.[1]

II.    LAW GOVERNING ADMISSION OF EXPERT TESTIMONY

     Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The Rule 702 standard incorporates the principles enunciated in Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589, 597 (1993), in which the Supreme Court held that trial courts have a "gatekeeping" function to "ensure that any and all scientific testimony or evidence

---

[1]  See Notice of Motion to Strike the Expert Report of Robert E. Allen Submitted by Counterclaim Defendants, filed Nov. 5, 2013 (Docket # 199); Protoons Mem.; Mullins Decl.; Counterclaim Def. Mem.; Declaration of Michael Delehanty in Opposition to Protoons' Motion to Strike the Expert Report of Robert E. Allen, filed Nov. 12, 2013 (Docket # 203); Reply Memorandum of Law in Further Support of Protoons' Motion to Strike the Expert Report of Robert E. Allen, filed Nov. 19, 2013 (Docket # 204) ("Reply Mem.").

admitted is not only relevant, but reliable," and in Kumho Tire Co. v. Carmichael, 526 U.S. 137

(1999), in which the Supreme Court held that Daubert's general gatekeeping obligation "applies

not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical'

and 'other specialized' knowledge," id. at 141 (citing Fed. R. Evid. 702).

 "One of the fundamental requirements of Rule 702 is that the proposed testimony 'assist

the trier of fact to understand the evidence or to determine a fact in issue.'"  In re Rezulin Prods.

Liab. Litig., 309 F. Supp. 2d 531, 540 (S.D.N.Y. 2004) (quoting Fed. R. Evid. 702); accord

Nimely v. City of N.Y., 414 F.3d 381, 397 (2d Cir. 2005); In re Initial Pub. Offering Sec. Litig.,

174 F. Supp. 2d 61, 68 (S.D.N.Y. 2001) ("As Rule 702's plain language shows, the opinion of an

expert witness is only admissible if it (1) assists the trier of fact in (2) understanding the

evidence or determining a disputed fact.") (emphasis in original).  The  requirement that expert

testimony assist the trier of fact is "akin to the relevance requirement of Rule 401, which is

applicable to all proffered evidence [,][but] . . . goes beyond mere relevance . . . because it also

requires expert testimony to have a valid connection to the pertinent inquiry."  Rezulin, 309 F.

Supp. 2d at 540 (quoting 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal

Evidence § 702.03[1] (Joseph M. McLaughlin ed., 2d ed.1997)) (alterations in original).  As with

all testimony, the expert's testimony not only must be relevant under Fed. R. Evid. 401, see, e.g.,

Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 265 (2d Cir. 2002), but is also subject

to exclusion under Fed. R. Evid. 403 where its probative value is substantially outweighed by the

danger of unfair prejudice or other factors, see, e.g., Nimely, 414 F.3d at 397.

 Additionally, Rule 702 requires that expert testimony rest on knowledge, which is more

than "subjective belief or unsupported speculation."  See Atlantic Specialty Ins. v. AE Outfitters

Retail Co., 2013 WL 5289013, at *10 (S.D.N.Y. Sept. 20, 2013) (citing Rezulin, 309 F. Supp. 2d

at 543).  Accordingly, expert testimony that is "speculative or conjectural" is inadmissible.  Id. (citing Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996)).  Similarly, expert opinions that are "conclusory" must be excluded.  See Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 311 (2d Cir. 2008) (rejecting expert's conclusory statement where it was not accompanied by "any evidentiary citation" or followed by any elaboration of the expert's reasoning).

Nonetheless, not all expert testimony is based on scientific or technical knowledge.  A party may also offer expert testimony based on "other specialized knowledge" and may be qualified merely by his "experience" rather than by any education or training.  See Fed. R. Evid. 702; see also Kumho Tire Co., 526 U.S. at 156 (expert may "draw a conclusion from a set of observations based on extensive and specialized experience").  In such a situation, "an expert basing his opinion solely on experience must do more than aver conclusorily that his experience led to his opinion, and must do more than propound a particular interpretation of [a party's] conduct."  Highland Capital Mgmt., L.P. v. Schneider, 379 F. Supp. 2d 461, 473 n.2 (S.D.N.Y. 2005) (internal punctuation and citation omitted).  Rather, "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC, 691 F. Supp. 2d 448, 473 (S.D.N.Y. 2010) (quoting Fed. R. Evid. 702 advisory committee's note); accord U.S. ex. Rel. Jones v. Brigham & Women's Hosp., 678 F.3d 72, 94 (1st Cir. 2012).

The burden of proving the admissibility of expert evidence, as with all evidence, rests with the proponent — here, the counterclaim defendants.  See, e.g., United States v. Williams,

9

506 F.3d 151, 160 (2d Cir. 2007); Fed R. Evid. 702 advisory committee's note ("[T]he admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence.").  In deciding whether to admit challenged expert testimony under Rule 702, a trial court may choose, but is not required, to hold an evidentiary hearing.  See Davis v. Carroll, 937 F. Supp. 2d 390, 411 (S.D.N.Y. 2013); accord Malletier v. Dooney & Bourke, Inc., 525 F. Supp. 2d 558, 581 (S.D.N.Y. 2007) ("Whether to hold a Daubert hearing is within the discretion of the court.") (citing Committee Note to 2000 Amendment to Rule 702); Colon ex rel. Molina v. BIC USA, Inc., 199 F. Supp. 2d 53, 71 (S.D.N.Y. 2001).  The law requires only that the parties "have an opportunity to be heard before the district court makes its decision," Miller v Baker Implement Co., 439 F.3d 407, 412 (8th Cir. 2006) (internal quotation marks and citation omitted), and an evidentiary hearing "is unnecessary when the evidentiary record pertinent to the expert opinions is already well-developed." Malletier, 525 F. Supp. 2d at 581.  Here, the parties have provided extensive briefing on the admissibility of Allen's report and do not seek to introduce any live testimony.  Accordingly, we conclude that an evidentiary hearing regarding the challenged expert report is unnecessary.  See, e.g., Williams, 506 F.3d at 161 (where evidentiary record was fully developed, the "formality of a separate hearing was not required"); Malletier, 525 F. Supp. 2d at 582 (Daubert hearing unnecessary where "the parties have extensively briefed the issues pertinent to each expert's testimony . . . [and] [e]ach of the expert's reports (as well as each of the reports of experts challenging the reliability of some of those reports) has been submitted to the court").

III.     DISCUSSION

        Protoons argues that Allen's testimony should be stricken under Rule 702 because it is

irrelevant, and in the alternative, because it is unreliable.  See Protoons Mem. at 8-15; Reply

Mem. at 3-14.  We discuss each of these objections separately.

        A.      Relevance

        To determine whether the Allen Report contains any relevant opinions or conclusions, we

begin by identifying the issue that the testimony is offered to support.  As Protoons correctly

notes, a plaintiff asserting a tortious interference claim under New York law must prove that the

defendant had "actual knowledge" of the breached contract.  See Protoons Mem. at 9-10 (citing

Medtech Prods. Inc. v. Ranir, LLC, 596 F. Supp. 2d 778, 796 (S.D.N.Y. 2008) ("[a]lthough a

defendant need not be aware of all the details of a contract, it must have actual knowledge of the

specific contract.") (internal citation omitted)).  Because proof of actual knowledge is required,

cases have held that an allegation in a complaint that a defendant "should have known" of the

contract in question — or, in other words, that a reasonable person in the defendant's position

would have known of the contract – are not sufficient to state a claim under Fed. R. Civ. P.

12(b)(6).  See, e.g., Medtech, 596 F. Supp. 2d at 796 n.13 ("Allegations that [the defendants]

'should have known' of the contracts, however, even if proven, will not ultimately satisfy the

second element of this claim, and are therefore stricken.")  Protoons uses this legal doctrine to

argue against the admissibility of Allen's proposed testimony on the ground that it was

introduced for "the obviously irrelevant purpose of claiming that it would be reasonable for the

Reach Parties not to believe Levinsohn's statements that the Songwriter Agreements existed."

Protoons Mem. at 10.

        Protoons' argument is essentially that if the "actual knowledge" requirement is not

11

satisfied by proof that a "reasonable" person would have known the contract existed, a party should not be permitted to offer evidence that a reasonable person would have believed that no contract existed.  The flaw in this logic, however, is that it does not consider the purpose for and context in which the testimony would be offered.  In this case, the parties contest Closter's actual knowledge of the songwriter agreements.  The counterclaim defendants can certainly offer Closter's own testimony as to what his personal belief was.  But they are also entitled to offer circumstantial evidence that would support a jury's decision to reject Protoons' assertion that Closter had such actual knowledge.  If it were the custom and practice in the industry for a party holding songwriting rights to provide copies of a contract in the circumstances that Levinsohn found himself in, and Levinsohn failed to follow this custom and practice, then Levinsohn's refusal to provide copies or other documentation would make it "less probable" that Closter actually believed that there was a contract than would be the case "without [this] evidence." Fed. R. Evid. 401.  Thus, we reject Protoons' contention that "whether the Reach Parties should have known about the Songwriter Agreements, or the reasonableness of any 'belief' regarding the existence of the Songwriter Agreements, is simply not relevant to whether the Reach Parties had actual knowledge of the Songwriter Agreements."  Protoons Mem. at 10.  To the contrary, Closter's having good reason to believe that Protoons did not actually have a songwriting agreement with Reeves is highly relevant as it constitutes circumstantial evidence as to what beliefs Closter actually held.

Also, a jury might find such testimony helpful in deciding this case.  A juror with no knowledge of the entertainment industry might be reluctant to draw the inference that Levinsohn's conduct conveyed to Closter that there was no contract.  Instead, the juror might assume that it is normal practice in the music industry to refuse to share private music contracts

with outsiders for any reason.  If it were proven to the juror that it was the custom and practice in the industry to share such agreements in the situation presented here, the juror could more easily draw the inference that Levinsohn's failure to provide a copy of the contract conveyed to Closter that no such contract existed.  It is of course common for testimony regarding the "customs and practices" in a particular industry to be the subject of expert testimony.  See, e.g., SR Intern. Bus. Ins. Co., Ltd. v. World Trade Center Props., LLC, 467 F.3d 107, 133 (2d Cir. 2006) (broker and underwriter in the insurance industry may testify regarding the "customs and practices of the insurance industry"); Fidelity Nat. Title Ins. Co. v. Cole Taylor Bank, 878 F. Supp. 2d 453, 457 (S.D.N.Y. 2012) (insurance industry executive could testify about the customs and practice of the title insurance industry because "her testimony clarified some of the terminology in the relevant evidence"); Pension Comm. of Univ. of Montreal Pension Plan, 691 F. Supp. 2d at 474 (allowing hedge fund administrator to testify about the customs and practices of that industry); Media Sport & Arts s.r.l. v. Kinney Shoe Corp., 1999 WL 946354, at *3 (S.D.N.Y. Oct. 19, 1999) (admitting expert's opinion "regarding the customs and practices of the sports industry, an analysis of whether the conduct of the parties in this action conformed to those customs, and whether such behavior evidences the parties' intent to be bound by contract"); Gill v. Arab Bank, PLC, 893 F. Supp. 2d 523, 537 (E.D.N.Y. 2012) (allowing experts to testify about custom and practices of the banking industry because such testimony "[would] be valuable to a jury likely to be unfamiliar with such topics").  Accordingly, we find the sections of the Allen Report in which Allen opines about the custom and practice in the music industry and Protoons and Levinsohn's deviation from that standard to be relevant to the issue of Reach's actual knowledge.[2]

---

[2] We also reject Protoons' argument, see Protoons Mem. at 8, that this testimony should be excluded under Federal Rule of Evidence 403 because its "probative value is substantially

However, some statements in the "Basis of Opinion" section of the Allen Report relate to issues that are not relevant. Specifically, we find irrelevant Allen's opinions regarding Protoons' actions occurring after the filing of the lawsuits — specifically Protoons' continued refusal to provide the songwriter agreement even after the lawsuit was filed. <u>See</u> Allen Report at 7. Protoons' counterclaim alleges that the tortious interference occurred when the counterclaim defendants induced Reeves file lawsuits against Protoons on September 8, 2008, October 2, 2008, and June 17, 2009. <u>See generally</u> Am. Compl. ¶¶ 56-67. Thus, any statements about custom and practice that are based on Protoons' refusal to provide the agreements in the period after June 17, 2009 — the date the last lawsuit was filed — are not relevant to Protoons' counterclaims, and no expert testimony related to Closter's knowledge may be offered as to actions taken after that date.[3]

Protoons also argues that Allen should not be allowed to offer a "lengthy factual narrative." Reply Mem. at 7. Protoons is correct that "an expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence." <u>Highland</u>, 379 F. Supp. 2d at 469 (citing <u>Rezulin</u>, 309 F. Supp. 2d at 551). Here, however, the factual assertions contained in Allen's report simply provide the foundation for Allen's opinion as to the custom and practice in the industry in the situation he describes. At trial, the factual assertions he relies on obviously would have to be supported by admissible evidence and thus

_____

outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." We believe that the jury will be able to give proper weight to Allen's testimony regarding industry practice in deciding the issue of Closter's actual knowledge.

[3] Consistent with this ruling, Protoons will be precluded from offering evidence on Closter's knowledge of the contracts after the June 17, 2009 date as well.

Allen could not present these facts to the jury for the purpose of describing what actually took place.  Rather, Allen would present these facts as the predicate for his opinion testimony.

      B.    <u>Reliability</u>

Protoons also argues that "[t]he Allen Report should be stricken [because] it contains no specialized knowledge based upon any reliable methodology regarding any matter, including purported custom and practice, relevant to any issue in this action."  Protoons Mem. at 11.

As explained in the Advisory Committee Notes to Fed. R. Evid. 702, "[s]ome types of expert testimony will not rely on anything like a scientific method, and so will have to be evaluated by reference to other standard principles attendant to the particular area of expertise."  Moreover, "[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony."  <u>Id.</u>  This does not mean that an expert may give an unsupported opinion merely because the expert has experience in a particular field.  <u>See</u> <u>generally</u> <u>LinkCo, Inc. v. Fujitsu Ltd.</u>, 2002 WL 1585551, at *4 (S.D.N.Y. July 16, 2002) (experts "must provide some explanation for their conclusions, rather than referring generally to their experience [because] [w]ithout good explanations, courts cannot assess the reliability of any conclusion drawn by an expert, even if he possesses relevant experience").  Rather, "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  Fed. R. Evid. 702 advisory committee's note; <u>accord</u> <u>Ge Dandong v. Pinnacle Performance Ltd</u>, 2013 WL 5658790, at *14 (S.D.N.Y. Oct. 17, 2013); <u>Pension Comm. of Univ. of Montreal Pension Plan</u>, 691 F. Supp. at 473 n. 148; <u>Highland</u>, 379 F. Supp. 2d at 473 n.2.

      Allen's report explains how his experience led to his conclusion that it is the custom and

practice in the industry to provide, in the circumstances assumed by Allen, documentation to demonstrate a copyright holder's rights.  He also provides an explanation of how that experience is a sufficient basis for his opinion and that it was reliably applied to generate this opinion. Specifically, Allen explains that he has worked on contracting issues in the music industry for more than 18 years, see Allen Report at 1-3, and that he has "never encountered" an attorney who behaved as Levinsohn had in "assert[ing] his or her client's rights as a copyright owner, while at the same time withholding the ownership documentation in his or her possession, and declining to produce them until after a lawsuit was filed," id. at 4.  To the contrary, Allen has observed entertainment industry attorneys providing such documentation on "numerous occasions."  See id.  Although Allen could have been provided more details on this experience, these statements are sufficient to support the relatively simple proposition he is advancing here. Cf. SR Intern. Bus. Ins. Co., Ltd., 467 F.3d at 132-33 (foundation was sufficiently reliable for expert to testify about particular practices where expert had "30 years of experience in the insurance industry" and was "familiar with practices in the industry"); Pension Comm. of Univ. of Montreal Pension Plan, 691 F. Supp. 2d at 474 (expert's "experience as a hedge fund administrator provides a sufficient basis for him to testify about the customs and practices of hedge fund administrators").  As was noted in another case where a party questioned an expert's methodology for arriving at an opinion, the counterclaimants' objections "go to the weight of [the] expert testimony, not its admissibility in the first instance."  Emig v. Electrolux Home Prods. Inc., 2008 WL 4200988, at *9 (S.D.N.Y. Sept. 11, 2008).

The same is true for Protoons' contention that Allen's report omits important facts. Protoons Mem. at 14-15.  Such alleged omissions may be explored on cross-examination but do not affect the admissibility of Allen's opinions.  See, e.g., Boucher, 73 F.3d at 21 (as long as

expert's assumptions are not "so unrealistic and contradictory as to suggest bad faith," arguments that the "assumptions are unfounded go to the weight, not the admissibility, of the testimony") (internal citations and quotation marks omitted).

IV.   <u>CONCLUSION</u>

For the foregoing reasons, Protoons' motion to strike the expert report of Robert Allen (Docket # 199) is denied to the extent stated in this Opinion and Order.  Obviously, Protoons' request for attorney's fees, <u>see</u> Protoons Mem. at 6 n.4, is also denied.

Dated:  December 23, 2013
        New York, New York

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge

17