USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: **NOV 1 0 2014**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

REACH MUSIC PUBLISHING, INC. et al.,                      :

                 Plaintiff,                                    :

          -v-                                              :

WARNER/CHAPPELL MUSIC, INC. et al.,                      :

               Defendants.                                  :

-----------------------------------------------------------------X
                                   :

PROTOONS INC.,                                            :

                 Counterclaimant,                              :

          -v-                                              :

REACH MUSIC PUBLISHING, INC. and                          :
DAVID REEVES,                                             :

        Counterclaim Defendants,                         :

         -and-                                           :

REACH GLOBAL INC. and MICHAEL                             :
CLOSTER,                                                  :

      Additional Counterclaim Defendants.:

-----------------------------------------------------------------X

09 Civ. 5580 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

     Run-D.M.C. released "Run's House" and several other songs in the
late-1980s; decades later, these songs are at the center of a copyright ownership
dispute.  The instant action arises out of a series of contracts that counterclaim
defendant David Reeves, who co-wrote the Run-D.M.C. compositions, signed with

the publisher Rush Groove Music ("Rush Groove") in 1988 and 1989.[1]  In those Songwriter Agreements, Reeves transferred to Rush Groove his interest in numerous Run-D.M.C. compositions, in exchange for a share of future income generated from the compositions.  Rush Groove, however, only paid Reeves through 1990.

The dispute deals with the questions of (1) whom Reeves can sue to enforce his rights, and (2) if the Songwriter Agreements left him with any mechanism by which he could recover royalty fees.  The contracts state that the only entity from which Reeves can collect is Rush Groove; but Reeves asserts that a suit against Rush Groove would be fruitless as that entity went out of business.  Instead, he turned to Protoons Inc., another music publisher, who is also an assignee of Rush Groove's interest in the Run-D.M.C. compositions.

The Songwriter Agreements expressly contemplated the transfer of Rush Groove's interest in the compositions to Protoons, and included an express covenant that Reeves not sue Protoons regarding his rights in the songs.  Protoons was deemed a third-party beneficiary of the Songwriter Agreements.  Reeves and Rush Groove also agreed that the prevailing party in a suit "between the parties" would be liable for attorneys' fees; Reeves and Protoons disagree about that provision's applicability to their covenant not to sue.

---

[1] The so-called Songwriter Agreements consist of multiple contracts for individual songs.  The Court analyzes the contracts through the single exemplar contract provided by the parties – a contract for the song "Run's House" signed by Reeves, the other co-writers, and Rush Groove on May 1, 1988. (Counter-Resp. of Protoons, Inc. to Countercl. Defs.' Resp. to Protoons' Rule 56.1 Statement of Undisputed Facts in Supp. of its Mot. for Summ. J. and Resp. to Counterstatement of Material Facts in Opp'n to Protoons' Mot. For Summ. J. ("C.P. 56.1 C.R.") at 10, ECF No. 238, Lepera Decl. ¶ 2, Ex. 1.)

In 2007, after becoming indigent while songs like "Run's House" continued to have commercial success, Reeves entered into an agreement with Reach Global, yet another music publisher.[2]   In that agreement, Reeves transferred to Reach a portion of the copyright interest in the same Run-D.M.C. compositions already owned by Protoons in exchange for $55,000.  Reeves and Reach then filed this action on June 17, 2009 against Protoons and Warner/Chappell Music Publishing ("Warner/Chappell").[3]  (ECF No. 1.)  In that initial action, Reeves and Reach asserted that they were co-owners of the Run-D.M.C. compositions, and that Protoons and Warner/Chappell must account for any income received from exploitation of the compositions over the prior two decades.  Protoons asserted counterclaims on November 20, 2009 (ECF No. 23), and the complaint was ultimately dismissed on August 12, 2010 (ECF No. 61).[4]

Protoons counterclaims (1) against Reeves for breach of contract for bringing suit in violation of the covenant not to sue, and (2) against Reach for tortiously interfering with the Songwriter Agreement by inducing Reeves to sue Protoons in violation of the covenant not to sue.

On March 28, 2014, following a long period of discovery, the parties cross-moved for summary judgment on the counterclaims.  (ECF Nos. 212, 216.) On May 19, 2014, the summary judgment motions were fully briefed, and on May

---

[2] Michael Closter is the principal and sole owner of both Reach Global, Inc., and Reach Music Publishing, Inc. (C.P. 56.1 C.R. at 4.)  Reach Global is the predecessor-in-interest of Reach Music. Hereinafter, the Court refers to Closter, Reach Global, Inc., and Reach Music Publishing, Inc. simply as "Reach."

[3] Warner/Chappell Music Publishing is not a party to this counterclaim action.  They were party to the original action as they had acquired rights to the Run-D.M.C. compositions through Protoons.

[4] Protoons amended its counterclaims on November 24, 2010 (ECF No. 68).

3

29, 2014, the matter was transferred to the undersigned judge.  The Court finds in
Protoons' favor on both claims.  Reeves long ago sold all rights to the subject songs –
including his entire copyright interest – in exchange for royalty payments.  In that
agreement, Reeves acknowledged that the songs could be transferred to Protoons
but that he would only ever seek royalty payments from Rush Groove; he also
expressly relinquished any right to seek royalty payments from Protoons.  The
contractual language to which Reeves agreed is plain, standard, and valid.

Rather than seek relief from Rush Groove or its principals, Reeves instead
initiated litigation against Protoons.  Reach purported to acquire an interest in the
songs to which Reeves long ago gave up all rights, and then initiated legal
proceedings on their and his behalf.  Years of litigation ensued.  Reach had ample
warning that Reeves had signed away his rights in the Run-D.M.C. songs; however,
there is a triable issue as to whether they had sufficient prior knowledge of the
particular covenant not to sue in the Songwriter Agreements.  While Protoons did
not have to produce the Songwriter Agreements for the breach of contract claim, its
failure to produce the document, offer sufficient detail of the covenant not to sue, or
otherwise insure that Reach had sufficient knowledge, means that Protoons cannot
win summary judgment on this claim.  For these reasons, and as set forth below,
Protoons' motion for summary judgment is GRANTED and Reeves and Reach's
motion is DENIED as to the breach of contract; both parties' motions are DENIED
as to the tortious interference claim.

## I.     FACTUAL BACKGROUND[5]

David Reeves is a songwriter who co-wrote a number of compositions which

were recorded by the musical group Run-D.M.C. in the 1980s. (C.P. 56.1 C.R. at 8.)

In 1988 and 1989, Reeves executed a number of Songwriter Agreements in which he

transferred his interest in those songs to Rush Groove, a music publishing company,

in exchange for a share of the profits generated from the songs. (Id.) The parties

dispute the circumstances under which those contracts were executed, as well as

their legal validity and enforceability. (Id.)

Reeves and Reach concede that Reeves signed the agreements—or, at very

least, that it is his signature that appears on them. (Countercl. Defs.' Counter-

Resp. and Resp. to Protoons' Resp. and Counterstatement of Material Facts ("C.D.

56.1 C.R.") at *4,[6] ECF No. 241; C.P. 56.1 C.R. at 10–11.)

Reeves asserts that he does not recall signing the Songwriter Agreements

and, in any event, did not understand their contents or effect at the time of signing

– that he would, by signing them, assign his copyright to Rush Groove. (C.D. 56.1

C.R. at *4-5.)[7]  Reeves alleges that he was not provided with copies of the contracts.

---

[5] The following facts are undisputed by the parties except where otherwise indicated.

[6] This document is not paginated.

[7] Protoons argues that the Court should disregard these allegations on the basis of the "sham issue of fact" doctrine, "which prohibits a party from defeating summary judgment simply by submitting an affidavit that contradicts the party's previous sworn testimony." In re Fosamax Products Liability Litigation, 707 F.3d 189, 193 (2d Cir. 2013) cert. denied, 133 S. Ct. 2783, 186 L. Ed. 2d 234 (2013). Protoons points to sections of Reeves' deposition as sworn testimony that it contends contradict his allegations on this point. (E.g., C.D. 56.1 C.R. at *4.) However, "[i]f there is a plausible explanation for discrepancies in a party's testimony, the court considering a summary judgment motion should not disregard the later testimony because an earlier account was ambiguous, confusing, or simply incomplete." Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 106 (2d Cir. 2011) (quotation marks and citation omitted).  A cursory review of the transcript of the deposition in question reveals the ambiguous and confused nature of the colloquy between Reeves and Protoons' attorney.  Furthermore, Reeves and Reach have advanced a plausible explanation for any

5

(Id. at *20.) The parties do agree that Reeves was not represented by counsel at the meeting where he signed the agreements, although Protoons points to Reeves' testimony that he had relationships with various lawyers in and around 1988 and 1989. (C.P. 56.1 C.R. at 11; C.D. 56.1 C.R. at *6–7.)

The Songwriter Agreements were signed by Reeves, other co-writers of the Run-D.M.C. songs and Rush Groove. (C.P. 56.1 C.R. at 10; Lepera Decl. ¶ 2, Ex. 1.) Protoons was not a direct party to the agreement; however, the contract specifically provides that Protoons "shall be deemed third party beneficiaries" of the agreement. (C.P. 56.1 C.R. at 15). Protoons' rights are set forth in paragraphs 9 through 14 of the agreement. (C.P. 56.1 C.R. at 10; Lepera Decl. ¶ 2, Ex. 1.) An assignment from Rush Groove to Protoons was explicitly anticipated in the contract. The contract provides that "[Rush Groove] may assign this agreement to Protoons Inc., including any or all of [Rush Groove's] rights and interests hereunder and the benefits of Writer's warranties, representations, authorization, duties, obligations, liabilities and indemnifications hereunder." (C.P. 56.1 C.R. at 15.) Paragraph 14 of the agreement further provides, in relevant part,

> Writer [i.e., Reeves] shall look solely to [Rush Groove] for any and all payments due in connection with the use, reproduction and other exploitation of the Composition and in connection with the enforcement of any rights or remedies which Writer may have hereunder, even if Profile or Protoons suspend their obligations to account and/or pay royalties or other sums to [Rush Groove]. Under no circumstances shall Writer look to Profile or Protoons for any payments in connection with the use, reproduction or other exploitation of the Composition. Writer hereby releases and discharges

---

discrepancy, in observing that "Reeves became tired and struggled to focus over the course of a very long deposition day, which by the end, left him confused and exhausted by Protoons['] repetitive and circular questioning," with appropriate citation to telling sections of the deposition transcript. (C.D. 56.1 C.R. at *5.)

> Profile Records Inc., Protoons, Inc., Promuse, Inc. and their officers,
> principals, heirs, executors, administrators, successors, licensees and assigns
> from all actions, suits, debts, dues, sums of money, accounts, reckonings,
> bonds, bills, specialties, covenants, contracts, controversies[,] agreements,
> promises, variances, trespasses, damages, judgments, executions, claims and
> demands whatsoever, whether or not reflected in demand letters, in law,
> admiralty or equity, which against Profile Records Inc., Protoons, Inc.,
> Promuse, Inc. and their officers, principals, heirs, executors, administrators,
> successors, licensees and assigns Writer ever had, now has, or hereafter can,
> shall or may, have for upon, or by reason of any matter, cause or thing
> whatsoever from the beginning of the world and continuing in perpetuity
> relating to the copyrights and all other rights in and to the Composition.

(emphasis added) (C.P. 56.1 C.R. at 16–17.) The contract further states that "it is

agreed that the prevailing party in any finally adjudicated court action between the

parties shall be entitled to recover the reasonable attorney's fees incurred by such

party in connection therewith." (Id.)

Rush Groove did, in fact, assign its rights in the Run-D.M.C. songs to

Protoons. In 1998, Rush Groove, Protoons, and other relevant parties—but not

Reeves—entered into an agreement in which Rush Groove confirmed its transfer of

the relevant copyrights to Protoons. ("1998 Agreement.") (Id. at 21.) The

agreement provided, inter alia, that Protoons would succeed to all rights,

warranties, representations, and indemnifications made to Rush Groove. (Id.)

Reeves received and accepted payments from Rush Groove until 1990. (Id. at

19.) Subsequently, he ceased receiving payments in connection with the Run-

D.M.C. works in question. (Id.) The works, meanwhile, went on to have a measure

of commercial success; for example, "Run's House" became the theme song of an

MTV television show also called "Run's House" in 2005. (Id. at 75.) Reeves

ultimately became indigent and was homeless in 2006 and 2007 while "Run's

7

House" aired on MTV. (Id. at 7.) Protoons contends that, despite the assignment, the contractual language makes clear that Rush Groove was still responsible for making accountings to Reeves. (E.g., C.D. 56.1 C.R. at *84–85.) Reeves and Reach allege, however, that they could not pursue a claim against Rush Groove because it went out of business in 1999. (C.D. 56.1 C.R. at *14.) Protoons replies that Reeves could have sued Rush Groove or its principals because Rush Groove was "never an incorporated company, but rather was a business entity run by its principals, Russell Simmons and Lyor Cohen."[8] (Id.)

Reeves did not bring suit against Rush Groove, nor did he take any legal action for nearly two decades after he stopped receiving royalty payments. In 2007, Reeves entered into an agreement with Reach in which Reeves transferred to Reach 50% copyright interest in the works (or his income participation rights in them) in exchange for $55,000 and Reach pursuing additional payments for the songs on his behalf (including through litigation). (C.P. 56.1 C.R. at 29–30; see also Lepera Decl. Ex. 13 at ¶ 7; ECF No. 213.) Reeves authorized Reach to pursue litigation to enforce their joint interest in Reeves' works. (C.P. 56.1 C.R. at 28–29.)

In May 2008, before filing a lawsuit, Reach contacted Protoons regarding Reach's claim to a copyright interest in Reeves' Run-D.M.C. works. (Id. at 38.) The parties differ as to the precise content of the subsequent communications between the two companies. Protoons asserts that it made the contract known to Reach in a

---

[8] Russell Simmons was the Chairman and CEO of Rush Groove and co-founder of the hip hop music label Def Jam Records; Lyor Cohen was a principal of Rush Groove Music and former leader of two of the music industry's major labels (Island Def Jam Music Group and the Warner Music Group).

number of ways.  It first says that its counsel on or about June 2, 2008 verbally told Reach that Reeves had assigned his copyright interests in the Run-D.M.C. works and that Reach "would be responsible for costs" if it pursued legal action against Protoons.  (Id. at 38-39; Lepera Decl. ¶ 40, Ex. 39 [Levinsohn Depo. 69:22-70:7].)  It further asserts that its counsel e-mailed Closter that Protoons' copyright flowed from "signed agreements."  (Id. at 40.)  Finally, it claims that Closter had obtained the confidential 1998 Agreement – which did not include Reeves but confirmed Rush Groove's assignment to Protoons – by October 27, 2007.  (C.P. 56.1 C.R. at 34.)

Reeves and Reach argue that they were not aware of the detail in the Songwriter Agreements, especially the covenant not to sue.  They instead argue that on June 2, 2008, Protoons' counsel only told them that Reeves had "signed away all his rights" and that Protoons would "bury" Reach in litigation fees if they filed suit.  (Id. at 38-39)  Specifically, Reeves and Reach assert that Protoons' counsel did not disclose that the Agreements contained covenants not to sue Protoons; they do not allege that the statement that Reeves has "signed away all of his rights" was misunderstood.  (Id. at 39.)  They allege that Protoons' counsel said that Reach would be "responsible for costs," rather than attorney's fees per se.  (Id.) Reeves and Reach further allege that Protoons did not disclose the identities of the parties to the agreements, the dates of the agreements, or other important details that would allow proper context.  (Id.)  The parties agree that at no point in this 2008 correspondence did Protoons provide Reach with copies of the Songwriter Agreements.  (See e.g., C.D. 56.1 C.R. at *33–40, *72.)

9

In July 2008, Reach indicated to Protoons its intention to file suit in order to enforce Reeves' putative copyright interests in the Run-D.M.C. works.  (C.P. 56.1 C.R. at 41.)  On September 3, 2008, Reeves and Reach filed their first lawsuit against Protoons, Warner/Chappell, et al., in the Southern District of New York. (Id. at 42.)  See Reach Global et al. v. Warner/Chappell Music, Inc., et al., No. 08-cv-7722 (LTS).)  As discussed supra, Reeves and Reach initiated the instant action on June 17, 2009.  (Id. at 43.)

On July 20, 2009, after the current litigation began, Protoons confirmed to Reeves and Reach that it was in possession of the Songwriter Agreements.  (Id. at 44.)  On January 2010, Protoons provided copies of the Songwriter Agreements in its files.  (Id. at 45.)

## II.   STANDARD OF REVIEW

Summary judgment may not be granted unless a movant shows, based on admissible evidence in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On summary judgment, the Court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor."  Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the nonmoving party's claims cannot be sustained, the opposing party must set out specific facts

10

showing a genuine issue of material fact for trial.  Price v. Cushman & Wakefield, Inc., 808 F. Supp. 2d 670, 685 (S.D.N.Y. 2011); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," because "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist."  Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citations omitted); see also Price, 808 F. Supp. 2d at 685 ("In seeking to show that there is a genuine issue of material fact for trial, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial.").

Only disputes relating to material facts—i.e., "facts that might affect the outcome of the suit under the governing law"—will properly preclude the entry of summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").  The Court should not accept evidence presented by the nonmoving party that is so "blatantly contradicted by the record . . . that no reasonable jury could believe it."  Scott v. Harris, 550 U.S. 372, 380 (2007); see also Zellner v. Summerlin, 494 F.3d 344, 371 (2d Cir. 2007) ("Incontrovertible evidence relied on by the moving party . . . should be credited by the court on [a summary judgment] motion if it so utterly discredits the opposing

11

party's version that no reasonable juror could fail to believe the version advanced by the moving party.").

## III.   DISCUSSION

This action concerns Protoons' claim against Reeves for breach of contract, and against Reach for tortious interference with contract.   Reeves and Reach fail to raise a triable issue of fact as to either claim, and Protoons is entitled to judgment as a matter of law.

### A.   Breach of Contract

In order to make out a colorable breach of contract claim, a plaintiff must show: (1) an agreement; (2) adequate performance by plaintiff; (3) breach by the defendant; and (4) damages.   Fischer & Mandell LLP v. Citibank, N.A., 632 F.3d 793, 799 (2d Cir. 2011).

Protoons argues that Reeves materially breached his "unambiguous covenant not to sue" Protoons, as outlined in the Songwriter Agreements that he signed in 1988 and 1989.  (Protoons' Mem. of L. in Supp. 2, ECF No. 215.)  Specifically, it claims that, by bringing suit against Protoons to assert its copyright claim, Reeves breached the contractual term that he not "look to Profile or Protoons for any payments in connection with the use, reproduction or other exploitation of the Composition[s]."  (C.P. 56.1 C.R. at 16–17.)

The parties dispute whether (1) this covenant not to sue in the Songwriter Agreements is valid, and (2) whether Protoons has been damaged as required by the fourth element of a breach of contract claim.

1.  Contract Validity

Reeves argues at various points of its briefs that the Songwriter Agreements are (1) unenforceable, (2) invalid for failure of consideration, (3) invalid because of unilateral mistake, and (4) unconscionable.[9]

First, Reeves fails to raise a triable fact as to the enforceability of the contract. He argues that the release provision of the Songwriter Agreement is unenforceable because it "can only release past claims." (Reeves and Reach's Mem. of L. in Supp. 10.) Here, though, the contract explicitly states that the covenant not to sue applies to future claims. The contract obligates Reeves to look solely to Rush Groove for outstanding royalty payments and plainly releases Protoons of any claim from the "beginning of the world and continuing in perpetuity." (C.P. 56.1 C.R. at 16–17.) The contract provides that if Protoons suspended its obligations to Reeves, "neither Profile nor Protoons shall have any obligation to [Reeves] and no such suspension shall affect the validity or enforceability of this agreement." (Id.) Such explicit language is undoubtedly enforceable. See McMahan & Co. v. Bass, 250 A.D.2d 460, 461 (1st Dep't 1998) ("a covenant not to sue also applies to future claims

---

[9] To demonstrate the validity of the Songwriter Agreements, Protoons first relies on judicial rulings from previous stages of the case to demonstrate that Reeves transferred his copyright to Rush Groove. (Protoons' Mem. of L. in Opp'n. 7, ECF No. 234.) However, even if Reeves conceded that he signed the Songwriter Agreements, he is not precluded from later challenging the agreements as unconscionable. See Rompalli v. Portnova, 09 Civ. 3083 (RMB) (FM), 2010 WL 2034396 (S.D.N.Y. May 5, 2010). Furthermore, while Judge Swain found that Protoons adequately plead its breach of contract counterclaim as "the clear and unambiguous terms of the Songwriter Agreements prohibit Reeves from seeking to recover royalties from Protoons," allowing the breach of contract claim to go forward at the motion to dismiss stage is not a ruling on the merits. Reach Music Pub., Inc. v. Warner/Chappell Music, Inc., No. 09 Civ. 5580 (LTS) (GWG), 2011 WL 3962515, at *4 (S.D.N.Y. Sept. 7, 2011). At summary judgment, the Court has the opportunity to consider evidence produced during discovery that supports legal defenses. See Oppel v. Empire Mut. Ins. Co., 92 F.R.D. 494 (S.D.N.Y. 1981) (finding that it was not prevented from considering legal defenses that were previously rejected in a motion to dismiss stage).

13

and constitutes an agreement to exercise forbearance from asserting any claim which either exists or which may accrue").

Next, the contract is also not invalid for failure of consideration. Reeves agreed to sign a contract that included a release and covenant not to sue; in exchange for the rights he gave up in the agreement, Reeves received a healthy royalty rate. Reeves received royalty payments until 1990; that bargained-for exchange suffices to demonstrate consideration.

Next, Reeves similarly fails to raise a triable issue regarding invalidity because of a unilateral mistake. He argues that he "was never aware of any of the facts concerning [the contracts'] contents and execution." (Reeves and Reach's Mem. of L. in Supp. 14.) However, "[t]hat the party claiming unilateral mistake merely misunderstood the legal significance of a provision of the contract is not a ground for rescission." Lemus v. Manhattan Car Wash, Inc., No. 06 Civ. 15486 (MHD), 2010 WL 1372705, at *9 (S.D.N.Y. Mar. 26, 2010). Moreover, Reeves was one of several co-writers signing the agreements. Even if Reeves was the sole writer to misunderstand the unambiguous covenant not to sue Protoons, he cannot invalidate the contract on these grounds.

Finally, the parties focus much on their argument on whether the contracts are unconscionable. Under New York law, an unconscionable contract is one which "is so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable according to its literal terms." Gillman v. Chase Manhattan Bank, N.A., 534 N.E.2d 824, 828 (N.Y. 1988). "For a

14

contract to be held unconscionable, the party alleging the defect must generally show both substantive and procedural unconscionability." Clinton v. Oppenheimer & Co. Inc., 824 F.Supp.2d 476, 483 (S.D.N.Y. 2011). Here, Reeves has not raised a triable issue as to procedural unconscionability.

Several factors contribute to the determination of whether a contract clause is procedurally unconscionable, including "(1) the size and commercial setting of the transaction; (2) whether there was a 'lack of meaningful choice' by the party claiming unconscionability; (3) the 'experience and education of the party claiming unconscionability;' and (4) whether there was 'disparity in bargaining power.'" Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 787 (2d Cir. 2003) (quoting Gillman, 534 N.E.2d at 828). The purpose of this doctrine is "not aimed at disturbance of allocation of risks because of superior bargaining power but, instead, at the prevention of oppression and unfair surprise." Matter of State of New York v. Avco Financial Service, 406 N.E.2d 1075, 1078 (1st Dep't 1980) (internal citations omitted); see also Reznor v. J. Artist Management, Inc., 365 F.Supp.2d 565, 576 (S.D.N.Y. 2005) (finding no oppression or "lack of bargaining power" where a rock performer entered into a one-sided management contract, despite the claim that he was "duped" into it). The Second Circuit has rejected procedural unconscionability claims based on a plaintiff not reading the agreement, being offered an agreement on a "take it or leave it" basis, and not having a college degree. Ragone v. Atlantic Video at Manhattan Center, 595 F.3d 115, 122 (2d Cir. 2010).

Reeves and Reach nonetheless point to evidence that, <u>inter alia</u>, Reeves lacked memory of signing the agreements, he was unrepresented by counsel at the time, he did not keep any copies of the agreements, he did not read – much less understand – the agreements, and he "never even had an inkling that he was agreeing to refrain from suing Protoons." (Reeves and Reach's Mem. of L. in Supp. 11, ECF 219.)  There circumstances do not, however, raise an issue of fact as to procedural unconscionability.  First, no evidence contradicts that the signatures are Reeves.  In addition, failure to read an agreement one signs is no defense.  New York law has long provided that "one cannot generally avoid the effect of a release upon the ground that he or she did not read it or know its contents."  <u>Touloumis v. Chalem</u>, 156 A.D.2d 230, 232 (1st Dep't 1989); <u>see also</u> <u>Gillman</u>, 534 N.E.2d at 829. Similarly, there is "no requirement in the law that consultation with a lawyer must occur in order to render a contractual obligation enforceable."  <u>Skluth v United Merchants & Mfrs.</u>, 163 A.D.2d 104, 107 (1st Dep't 1990).  Many agreements are entered into without counsel on one side, the other, or both.  The language of the contract is plain on its face, and Reeves does not allege that he was prevented from further researching the provisions to gain a better understanding of their effect. Furthermore, Reeves was one of several signees of the Songwriter Agreements, and was not uniquely disadvantaged by negotiating with a bigger entity.  Accordingly, Reeves and Reach cannot demonstrate facts that satisfy the procedural unconscionability factors outlined in <u>Dallas Aerospace, Inc.</u>  They cannot defeat summary judgment based on the argument of contract invalidity.

2.   Damages

Reeves breached the valid covenant not to sue when he filed his lawsuit in
2008, but the Court must still find damages to award Protoons summary judgment
on its breach of contract counterclaim. Protoons argues that it was foreseeable to
Reeves that Protoons would incur damages of attorneys' fees if Reeves breached the
covenant not to sue. (Id. at 19-20.) It points to the express fee provision, and notes
that Reeves is liable for attorneys' fees because its lawsuit was brought in "obvious
breach [of covenant] or otherwise on bad faith." (Protoons' Mem. of L. in Supp. 21)
(citing Artvale, Inc. v. Rugby Fabrics Corp., 363 F.2d 1002, 1008 (2d Cir. 1966)).[10]
The breach of the covenant not to sue necessarily resulted in attorneys' fees, and the
Court must effectuate the unambiguous covenant not to sue and attorneys' fee
provision. In addition, Protoons is at least nominally damaged by Reeves' failure to
comply with his contractual obligations; to find otherwise would render the
covenant not to sue meaningless. See, e.g., McCoy Associates, Inc. v. Nulux, Inc.,
218 F. Supp. 2d 286, 294 (E.D.N.Y. 2002) (noting that "[w]henever there is a breach
of contract or the invasion of a legal right[,] the law infers some damage") (internal
citations omitted); C.K.S. Ice Cream Co. v. Frusen Gladje Franchise, Inc., 567
N.Y.S.2d 716, 718 (1st Dep't 1991) ("Even if it were shown that no actual damages

---

[10] Protoons also points to the fact that at the motion to dismiss phase, Judge Swain found that the
attorney's fees and costs allegation was "pertinent, and sufficient, with respect to the claim of breach
of the covenant not to sue." Reach Music Pub., Inc, 2011 WL 3962515, at *5. While the Court again
comes to that same conclusion, allowing the claim to go forward at the motion to dismiss stage is not
a ruling on the merits.

have been sustained, plaintiff would seem entitled to proceed to trial at least on its

contract cause of action[,] if only to vindicate its right to nominal damages.")

The Second Circuit, in its interpretation of New York law,[11] prevents parties

from recovering damages in the form of attorney's fees for a good faith violation of a

covenant not to sue, unless there exists clear contractual language providing for

attorneys' fees. See Artvale, 363 F.2d at 1008; Sauer v. Xerox Corp., 5 Fed.Appx.

52, 56 (2d Cir. 2001) (upholding the dismissal of a counterclaim alleging a violation

of an express covenant not to sue because there was "no affirmative indication that

violation of this provision of the lease gives rise to an independent cause of action

for attorney's fees."); Bellefonte, 757 F.2d at 529 (upholding the district court's

dismissal of a counterclaim for expenses incurred in defending a lawsuit because

the covenant not to sue lacked a clear provision for recovery of litigation expenses

and the plaintiffs suits "were not brought in bad faith"); Associated Financial Corp.

v. Kleckner, No. 09 Civ. 3895 (JGK), 2010 WL 3024746, at *5 (S.D.N.Y. Aug. 3,

2010) ("Under the American Rule, legal fees are not generally recoverable for breach

of a covenant not to sue unless there is a separate contractual provision providing

for such a recovery or unless the suit was brought in obvious breach of the covenant

or otherwise brought in bad faith."); Kamfar v. New York Restaurant Group, Inc.,

347 F. Supp. 2d 38, 51 (S.D.N.Y. 2004) (a party "normally may not recover

---

[11] The Second Circuit opinion in Artvale did not state explicitly whether its holding was based on
New York or federal common law, but subsequent cases have treated Artvale as expressing the
Second Circuit's view of New York law on this issue. See Bellefonte Re Ins. Co. v. Argonaut Ins. Co.,
586 F.Supp. 1286, 1288 (S.D.N.Y. 1984), aff'd, 757 F.2d 523; Versatile Housewares & Gardening
Systems, Inc. v. Thill Logistics, Inc., 819 F. Supp. 2d 230, 245 (S.D.N.Y. 2011) ("Artvale and its
progeny are generally taken to be the Second Circuit's view on New York law").

damages—i.e., litigation expenses—for breach of a covenant not to sue unless the parties specifically intended such recovery").

Violation of a covenant not to sue where there is also an express attorneys' fees provision, as here, is also sufficient for a finding of damages. Reeves spends most of his argument looking to Artvale, wherein a plaintiff violated its covenant not to sue by filing an unsuccessful patent suit. Artvale, 363 F.2d at 1004. The defendant counterclaimed, seeking attorneys' fees for breach of the covenant. Id. The Second Circuit affirmed the trial court's dismissal of the counterclaim, noting that, in the absence of language providing otherwise, the "primary function [of a covenant not to sue] is to serve as a shield rather than as a sword..." Id. at 1008. "[W]hether a party who has breached a covenant not to sue is liable for litigation expenses inflicted on his adversary . . . appears to hinge on what the parties intended by their contract." Id. Absent contractual language to the contrary, a party is not liable for his opponent's litigation expenses even when the suit is brought in conflict with a covenant not to sue, so long as it was "claimed in good faith that [the covenant not to sue] had been obtained by unfair means." Id.; see also Bellefonte, 757 F.2d at 529; Kamfar, 347 F. Supp. 2d at 51 (dismissing a breach of contract claim even where a defamation suit violated the unambiguous covenant not to sue because "the contractual language is silent, the breach is not obvious . . . and there is no evidence of bad faith.")

In following the reasoning of Artvale and its progeny, the Court first asks if the Songwriter Agreements include express language entitling Protoons to litigation

expenses should there be a breach of a covenant not to sue.  If yes, a simple demonstration of litigation expenses by Protoons is sufficient to meet the damages prong of a breach of contract claim.  If no, the Court then asks if Reeves brought this suit claiming in good faith that the covenant not to sue had been obtained by unfair means.

There is express language in the Songwriter Agreements providing, "it is agreed that the prevailing party in any finally adjudicated court action between the parties shall be entitled to recover the reasonable attorney's fees incurred by such party in connection therewith." (C.P. 56.1 C.R. at 16–17.)  Reeves argues that this "prevailing party" provision does not apply to Protoons because Protoons' rights are explicitly elucidated in paragraphs 9 through 14, and the provision appears in paragraph 15 wherein Protoons is not mentioned.  However, as explicitly anticipated in the contract, Rush Groove assigned its rights to Protoons.  In the very first paragraph of the contract, Reeves "sells, assigns and transfers" his interest in the song to Rush Groove, "its successors and assigns, for the world."  Moreover, the contract provides that Reeves "specifically acknowledges that [Rush Groove] may assign this agreement to Protoons Inc., including any or all of [Rush Groove]'s rights and interests hereunder." (C.P. 56.1 C.R. at 15.)  One of Rush Groove's contractual rights includes the right for reasonable attorneys' fees.  As expressly provided for in the contract, all of Rush Groove's rights – including the "prevailing party" provision – were assigned to Protoons.  Protoons thus inherits the "prevailing party" provision and can use it in conjunction with Reeves' covenant not to sue Protoons.  As the

contract expressly provides for attorneys' fees and Protoons has established

damages of attorneys' fees and costs as a result of Reeves' lawsuit,[12] Reeves cannot

raise a triable issue as to damages for his breach of contract.[13]

### B.   Tortious Interference

Protoons' second counterclaim alleges that Reach tortiously induced Reeves

to breach the covenant not to sue and related releases contained in the Songwriter

Agreement by purchasing the rights to the Run-D.M.C. compositions and jointly

filing suit with Reeves. To withstand summary judgment as to a tortious

interference claim under New York law, Reach must raise a triable issue as to one

of four elements: (1) that a valid contract exists between Reeves and Rush Groove;

(2) that Reach had knowledge of the contract; (3) that Reach intentionally and

improperly procured the breach of the contract; and (4) that the breach resulted in

damage to Protoons. See White Plains Coat & Apron Co., Inc. v. Cintas Corp., 460

F.3d 281, 285 (2d Cir. 2006) (citing Foster v. Churchill, 665 N.E.2d 153, 156 (N.Y.

1996)). Reach does so only as to the element of knowledge.

---

[12] The parties agree that Protoons has incurred substantial attorneys' fees and costs in defending
against the lawsuits filed by Reeves and Reach; however, Reeves and Reach argue that Protoons
unnecessarily caused and expanded the litigation. (C.P. 56.1 C.R. at 53). The Court only needs to
find that Protoons has established the element of damages for its breach of contract counterclaim.
[13] With Protoons having established damages of attorneys' fees and costs that resulted from Reeves'
breach, the Court need not turn to the question of whether Reeves brought this suit in good faith.
See Artvale, 363 F.2d at 1008 ("[W]e would not read such a covenant, without more, as intended to
subject to damages a plaintiff who claimed in good faith that it had been obtained by unfair means.")
Nonetheless, Reeves cannot assert good faith in his lawsuits against Protoons where the contract
explicitly protected Protoons from suit and required Reeves to instead collect from Rush Groove.
Reeves and Reach argue that Rush Groove ceased operations, meaning that Reeves could not recover
from them; but Reeves can still sue Rush Groove or its two principals Russell Simmons and Lyor
Cohen. (C.D. 56.1 C.R. at *14.)

The first and fourth elements have already been addressed <u>supra</u>; there exists a valid contract, the breach of which resulted in attorneys' fees and costs to Protoons.  As to the third element, the intentional procurement of a breach element requires a plaintiff to establish that but for the allegedly tortious conduct of the defendant, the third party would not have breached her contract.  <u>See</u> <u>Sharma v. Skaarup Ship Management Corp.</u>, 916 F.2d 820, 828 (2d Cir. 1990).  Furthermore, "to be actionable, the interference must be intentional and not incidental to some other lawful purpose."  <u>Health–Chem Corp. v. Baker</u>, 915 F.2d 805, 809 (2d Cir. 1990).  Here, Reach signed an agreement with Reeves for copyright interests wherein the only way Reach could profit necessitated suing Protoons.  Reach selected and paid for lawyers to file a lawsuit on Reeves' behalf.  It intentionally induced Reeves to pursue claims against Protoons in violation of his signed agreements in hopes that it could then profit from the copyright.

The heart of this dispute lies in the second element of tortious interference – whether Reach had knowledge of the covenant not to sue.  Here, there is a genuine dispute as to that material fact, preventing either party from winning judgment on the tortious interference claim as a matter of law.  While sufficiently clear that Reach had general knowledge of the Songwriter Agreements before filing its first action on September 3, 2008, it is not clear if Reach had the necessary knowledge of the covenant not to sue contained therein.

Reach must have actual knowledge of the covenant to be held liable for tortious interference.  <u>See</u> <u>MedTech Products, Inc. v. Ranir LLC</u>, 596 F. Supp. 2d

22

778, 796 (S.D.N.Y. 2008) ("New York law is clear on its requirement that a defendant charged with tortuously interfering with a contractual relationship have actual knowledge of the breached contract."). A claim for tortious interference will not lie if "[a] reasonably prudent person would not, in the circumstances, have assumed, as a matter of law, that there was a binding agreement." American Cyanamid Co. v. Elizabeth Arden Sales Corp., 331 F.Supp. 597, 608 (S.D.N.Y. 1971). However, plaintiff need not have perfect knowledge of the contract. See B. Lewis Productions, Inc. v. Angelou, No. 01 Civ. 0530 (MBM), 2005 WL 1138474 (S.D.N.Y. May 12, 2005) ("knowledge need not have to be perfect or precise"); Hidden Brook Air, Inc. v. Thabet Aviation Int'l Inc., 241 F. Supp. 2d 246, 279 (S.D.N.Y. 2002) (noting that the defendant need not "have been aware of the legal particulars of the contract"); Don King Productions, Inc. v. Douglas, 742 F. Supp. 741, 775 (S.D.N.Y. 1990) ("In a tortious interference action, a plaintiff is not required to prove that the defendant had perfect or precise knowledge of the terms and conditions of the contracts in issue."). Even though knowledge of the contract need not be perfect, Reach must have knowledge of the covenant not to sue in order to be liable for helping Reeves violate that particular contractual provision.

Reach brought the first lawsuit on September 3, 2008. There is ample evidence from preceding events that Reach understood the Run-D.M.C. compositions were subject to a binding agreement between Protoons and the co-writers; but there is not enough evidence to show that Reach understood the agreements included a covenant not to sue. In the agreement signed by Reach and

23

Reeves on July 19, 2007, Reach expressly acknowledges that other parties already lay claim to the rights.  (C.P. 56.1 C.R. at 40, Lepera Decl. ¶ 17, Ex. 13.)  The agreement states, "You have advised us that other parties including, but not limited to Warner/Chappell Music (the "Unauthorized Publishers"), are exercising rights in the Said Works, without your authority, and are not compensating you for such unauthorized use ("Disputed Works")."  The July 19, 2007 agreement sets out that Reach was to nonetheless keep 50% of any copyright interest recovered in the Disputed Works.  This was ultimately an agreement between Reeves and Reach that Reach would help Reeves sue other publishers.

By October 27, 2007, Reach obtained the 1998 Agreement which confirmed Protoons' acquisition of Rush Groove's interest in the Run-D.M.C. compositions.  (C.P. 56.1 C.R. at 34.)  That agreement was not signed by Reeves, but included co-writers of the Run-D.M.C. compositions.[14]  The agreement plainly states that Rush Groove and the co-writers confirm that "Protoons shall be the sole and exclusive owner of all right, title and interest in and to the Compositions, including, without limitation, the copyrights therein and any extensions and/or renewals thereof throughout the universe."  The 1998 Agreement says nothing about the covenant not to sue.

---

[14] Protoons furthermore points to Reach's communication with Joseph Simmons, a member of Run-D.M.C. who was a co-signatory of the Songwriter Agreements, and claims that Simmons could easily have shed light on the Agreements.  (C.P. 56.1 C.R. at 54.)  While curious that Closter – a sophisticated businessman – claims not to have asked Simmons or any of the other members of Run-D.M.C. about the Songwriter Agreements (Id. at 74.), Protoons cannot demonstrate Reach had the requisite knowledge of the covenant not to sue on this fact alone.

By June 2, 2008, Mark Levinsohn, Protoons' counsel, informed Michael Closter, head of Reach, that Protoons owned Reeves' copyright interest pursuant to signed agreements. There is a triable issue as to whether Reach gained knowledge of the covenant not to sue from this conversation. Reach asserts that the conversation between the two men merely consisted of Protoons' counsel stating that Reeves had "signed away all of his rights" and that Protoons would "bury" Reach in litigation fees if they pursued a claim. (C.P. 56.1 C.R. at 38). They also admit that Levinsohn told Closter that should Reach sue Protoons, he "would be responsible for costs." (Id. at 39.) Reach argues that Levinsohn did not impart knowledge of the covenant not to sue because he failed to convey the basic elements of the contract, who the parties were, or what rights and obligations were owed to any party. They further argue that Levinsohn did not use the words "attorney's fees" and did not produce the physical agreement. Protoons asserts that Levinsohn need not have used any particular words to warn Reach that pursuing a claim would result in litigation fees. The question of whether the conversation was sufficiently clear to impact knowledge of the covenant not to sue cannot be resolved on summary judgment. A trier of fact must, inter alia, evaluate industry norms and the credibility of witnesses to determine if the conversation – specifically, that Reach "would be responsible for costs" – imparted the requisite knowledge of the covenant not to sue. While Reach may have known that Reeves had signed an agreement, Protoons cannot show at this stage that Reach was necessarily aware of the contractual particularities.

Reach would have had knowledge of the contractual particularities had Protoons produced the Songwriter Agreements earlier.  Where production of the contracts was not necessary to win the breach of contract claim, it would have demonstrated knowledge of the covenant not to sue here.  Reach understood that a lawsuit to establish their own rights in the Run-D.M.C. compositions involved helping Reeves breach some contractual right owned by Protoons.[15]  It is for a trier of fact to decide if Reach knew one such contractual right was that Reeves could not sue Protoons.

---

[15] Reach's defense that they "acted with justification, as part of a pursuit of legitimate economic interests" is unavailing. (Reeves and Reach's Mem. of L. in Opp'n at 28.)  They had no economic interest in copyright they knew was already owned by Protoons.  Reach's economic interest in the copyright was premised on their success in maliciously suing Protoons.

IV.   CONCLUSION

For the reasons set forth above, Protoons' motion for summary judgment is GRANTED with respect to the breach of contract counterclaim and denied with respect to the tortious interference counterclaim.   Reeves and Reach's motion for summary is DENIED.

The parties shall appear for a conference on Monday, November 17, 2014 at 11:00 a.m.   The Court will set a trial date during that conference.

The Clerk of Court is directed to terminate the motions at ECF No. 212 and 216.

SO ORDERED.

Dated:      New York, New York
            November *10*, 2014

                                              K B. Forrest
                                   KATHERINE B. FORREST
                                   United States District Judge